# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**SNAP-ON INCORPORATED,**
            Plaintiff,

   v.                                                      Case No. 16-C-1265

**HARBOR FREIGHT TOOLS USA, INC.,**
            Defendant.

---

## DECISION AND ORDER

Plaintiff Snap-on Incorporated alleges that defendant Harbor Freight Tools USA, Inc., has infringed U.S. Design Patent No. D730,612 (the '612 patent). Before me now is Snap-on's motion for a preliminary injunction.

### I. BACKGROUND

Snap-on designs, markets, and sells tools, garage accessories, and other equipment. It primarily sells its products to automotive repair technicians and automotive service-shop owners through independently owned and operated franchises. These franchisees purchase Snap-on's products from Snap-on and operate Snap-on branded trucks. The franchisees then drive around to the service shops on their routes and offer to sell the shop owners and technicians the Snap-on products in their trucks. In addition to selling its products through franchisees, Snap-on sells through distributors and the Internet.

Snap-on's products include garage floor jacks, which are used to lift a portion of a vehicle from the ground so that the underneath of the vehicle can be accessed for service. These jacks typically use some type of hand-held mechanism, such as a lever, to operate a hydraulic pump that raises the vehicle using a lift arm. Before 2014, Snap-

on sold three different types of garage floor jacks.  In about 2012, Snap-on decided to create a new line of floor jacks, designed to be longer-lasting and of higher quality than the existing floor jacks on the market.  In 2013, Snap-on engaged a third-party, VIS, LLC, to help it design the new jacks.  The jacks that Snap-on eventually developed are known are the FJ200 2-ton jack and the FJ300 3-ton jack.  On June 18, 2014, VIS, LLC filed an application for a patent on the design embodied in the FJ200 and the FJ300.  On May 26, 2015, the '612 patent was granted to VIS, LLC, which later assigned the patent to Snap-on.  Snap-on began selling the FJ200 in August 2014, and it began selling the FJ300 in March 2016.  The retail price for the FJ200 is $550.50, and the retail price for the FJ300 is $651.25.

Harbor Freight also sells tools, including floor jacks.  It does so through retail stores and through its website.  In approximately August 2016, Harbor Freight began selling a floor jack known as the Daytona 3 Ton Super Duty Floor Jack.  The retail price for the Daytona is $199, and it has been on sale for as low as $179.  Thus, the Daytona is significantly cheaper than Snap-on's jacks.  However, Harbor Freight markets the Daytona as being able to perform as well as Snap-on's jacks.

After Snap-on learned of the Daytona, its representatives purchased one and compared it to the FJ200, the FJ300, and the '612 patent.  Snap-on concluded that the Daytona is substantially visually identical to the design protected by the '612 patent.  It therefore commenced this suit and filed the present motion for a preliminary injunction.

2

In an appendix to this decision and order, I reproduce three drawings from the '612 patent along with photographs of the Daytona taken from similar vantage points.[1]

## II.  DISCUSSION

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). In a patent case, "[t]o prove a likelihood of success on the merits, a patentee must prove that success in establishing infringement is 'more likely than not.'"  *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014).[2]  In the present case, I conclude that Snap-on has not shown a likelihood of success under this standard.  For this reason alone, Snap-on is not entitled to a preliminary injunction.  I therefore do not address the remaining factors.

---

[1] In the appendix, I do not include drawings and photos of the jacks when viewed directly from the front, back, or bottom.  That is because I do not refer to these views in the discussion that follows.  However, in assessing whether Snap-on is likely to show that the Daytona infringes, I have considered all of the drawings in the patent, even the ones not reproduced in the appendix, and have compared them to the photos showing the Daytona from similar vantage points.

[2] In its opening brief, Snap-on cited cases from the Seventh Circuit stating that, to show a likelihood of success on the merits, a plaintiff must show that its chances of prevailing are "better than negligible."  Br. at 14 (citing *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016)).  However, in its brief in opposition, Harbor Freight argued that, in cases involving patent rights, "the Federal Circuit's standard of whether success is more likely than not" applies, even in the face of a competing regional standard.  Br. in Opp. at 6 n.1 (citing *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012)).  In its reply brief, Snap-on did not dispute that the Federal Circuit's "more likely than not" standard applies.  Instead, Snap-on argued that it has shown that it is more likely than not to prove infringement.  Reply Br. at 1.  Thus, I view Snap-on as having conceded that the more-likely-than-not standard applies.

A design patent may be granted for any "new, original and ornamental design for an article of manufacture." 35 U.S.C. § 171. A design patent protects the nonfunctional aspects of an ornamental design as shown in the patent. *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995).

The test for infringement of a design patent is the "ordinary observer" test. *See e.g., Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670 (Fed. Cir. 2008) (en banc). To show infringement under this test, the patentee must show that an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design. *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010). However, if a design includes both functional and ornamental features, infringement occurs only if any perceived similarities in the patented and accused designs are based on the ornamental aspects of the designs, rather than on their functional aspects. *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, (Fed. Cir. 2006) (quoting *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 825 (Fed.Cir.1992)). In applying the ordinary-observer test, it is important to focus on whether the "overall designs" are similar and create deception, and to avoid looking for "similarities in ornamental features in isolation." *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010). Whether the ordinary observer would be deceived by the accused design is a question of fact, which a patentee must prove by a preponderance of the evidence. *Id.* at 1295.

The infringement analysis of a design patent proceeds in a slightly different manner than the infringement analysis of a utility patent. In a case involving a utility patent, the court proceeds in two steps. In the first step, commonly referred to as claim

4

construction, the court construes the patent claim to determine its meaning and scope. In the second step, the claim as properly construed is compared to the accused device to determine whether it infringes. *See, e.g.*, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). The Federal Circuit has held that this same two-step process applies to a case involving a design patent. *Elmer*, 67 F.3d at 1577. However, with respect to a utility patent, claim construction will almost always require the court to give a "detailed verbal description" of the claim. *See Egyptian Goddess*, 543 F.3d at 679. In contrast, for a design patent, the Federal Circuit has recognized that because design patents "typically are claimed as shown in drawings," claim construction must be "adapted accordingly." *Id.* (quoting *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.,* 501 F.3d 1314, 1319 (Fed. Cir. 2007)). Because it is difficult to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to "construe" a design patent claim by providing a detailed verbal description of the claim. *Id.* However, the district court has discretion to provide a verbal description of the claim if it thinks that it would be necessary or helpful. *Id.* at 679–80. Moreover, the district court can use claim construction to address other issues that bear on the scope of a claim, including "distinguishing between those features of the claimed design that are ornamental and those that are purely functional." *Id.* at 680.

In the present case, the claim consists of drawings, and I do not believe that a detailed verbal description of the claim is necessary or would be helpful. However, because many aspects of the design of a floor jack are functional, I will use claim construction to "factor out the functional aspects" of the design. *Richardson*, 597 F.3d at 1293; *see also OddzOn Prods., Inc. v. Just toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir.

5

1997) ("Where a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent."). On page nine of its brief in opposition to Snap-on's motion, Harbor Freight identifies the aspects of a floor-jack design that are functional. Moreover, the report of Harbor Freight's expert witness, Alan Ball, further identifies the aspects of the design that are functional. *See* Ball Decl., Ex. A at 7–12. From my review of Snap-on's reply brief, I conclude that Snap-on does not dispute that these aspects of the design are at least partially functional.[3] Thus, I will adopt Harbor Freight's identification of the functional aspects of the design as part of my claim construction. In this regard, the functional aspects are the following:

- A chassis comprising vertical side walls offset from each other, with fixed wheels in front and swiveling casters in back. The casters allow the jack to be more easily maneuvered as it is pushed or pulled by the user holding the handle. (Although the claimed design uses fixed wheels in front, the same function could be achieved by using a single roller instead of two wheels. Thus, the use of wheels rather than a roller is at least partially an ornamental aspect of the design.)

- The profile of the chassis is lower in front, and sloped up at the rear. The front is low to roll under the vehicle, and the rear is higher to accommodate the jack arm articulation and pump mechanisms.

- A jack arm which rises to lift the vehicle. The jack arm is situated between the two chassis walls and is shaped to correspond to the top edge profile of the chassis when lowered. The jack arm attaches to the chassis at pivots at the rear of the chassis. The jack arm has a bend, or contour, that allows the jack to get further below a low-profile vehicle than if the lifting arm sloped down in a flat, diagonal plane.

---

[3] To be sure, Snap-on disputes Harbor Freight's assertion that the overall design is "overwhelmingly functional" and also emphasizes that the functional elements can be designed differently, such that the overall design is not dictated by the underlying functional purpose. Reply Br. at 3. I agree with Snap-on on these points. However, before I move on to the ornamental aspects of the design, I must first identify the functional elements.

6

- A saddle at the end of the jack arm which contacts the under surface of the vehicle being jacked. The jack has support arms to keep the saddle horizontal as it is raised.

- A cover plate and a jack-arm cover. These prevent injury to the user and protect the internal components of the jack from damage and debris.

- A triangular yoke at the rear to accommodate a bar handle, which the user pumps to raise the vehicle.

- Exposed fasteners and fittings that protrude from the sides. This hardware holds the jack together and allows the jack mechanism to work.

- Horizontal flanges at the top and bottom edges of the chassis sides. The flanges add rigidity to the chassis side walls and provide larger top surfaces to better distribute forces and prevent damage should the chassis contact the underside of the vehicle being jacked.

- The rear casters attach to the chassis through caster mounting brackets. The brackets provide protective covering for the casters.

In the two images below, the functional aspects of the floor jack are labelled. The first image is of the claimed design. The second image is of a "generic" jack that contains most of the functional features of the claimed design, but is stripped of ornamentation. In the first image, the jack arm is lowered; in the second, it is raised.

7




8

As can be seen by comparing these two images, many of the functional components of a floor jack also have ornamental aspects. *See Sport Dimension, Inc. v. Coleman Co., Inc.*, 820 F.3d 1316, 1321 (Fed. Cir. 2016) (noting that functionality of certain elements of design does not preclude those elements from having protectable ornamentation). Although it is impractical to identify every ornamental aspect of the design, some of the more prominent ones are: (1) the shape of the top and bottom edge flanges; (2) the exact shape of the chassis side plate when viewed in profile, beyond being lower in front and higher toward the rear; (3) the shape of the rear caster brackets and how (or if) they attach to the bottom edge flange; (4) the design of the front wheels (or roller, if one is used instead of wheels); and (5) the shape of the saddle.

Having construed the claim, I turn to the second step of the infringement analysis, in which I compare the construed claim to the accused design to determine whether it infringes. As noted, to show infringement, the patentee must show that an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design. *Crocs, Inc.*, 598 F.3d at 1303. In the appendix, I include images of the patented design and the accused design. Here, I identify some of the prior art that Harbor Freight claims is "close" to the patented design and that an ordinary observer is most likely to regard as highlighting the differences between the claimed and accused designs. *See Egyptian Goddess*, 543 F.3d at 678–79 (noting that the accused infringer is the party that bears the burden of production regarding relevant prior art). The image below depicts the claimed design (D'612) in the upper left corner, and the accused design (the Daytona) in the lower right corner. The other jacks pictured are found in the prior art.

9



As the image above shows, the patented design is close to the design of many other floor jacks found in the prior art. "[W]hen the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer." *Egyptian Goddess*, 543 F.3d at 676. Thus, although the accused design is also close to the patented design, this does not automatically result in a finding of infringement. Rather, I must look more carefully at the overall designs to determine whether there are small differences that are likely to be important to the eye of an ordinary observer.

Comparing the patented design with the accused design in accordance with the standards and claim construction stated above, I conclude that a jury is not likely to find that the accused design infringes. Although the two designs are similar, the overall effect of each design on the eye of the ordinary observer is different, such that the ordinary observer, taking onto account the prior art, would not believe the accused design to be the patented design. The primary difference in the designs is that the patented design presents what might be described as a "streamlined," "light," or "sleek" overall appearance, while the accused design gives the impression of being wider, rounder, and heavier. The design of the top edge flanges and the rear caster brackets contributes significantly to these distinct overall impressions. When the jacks are viewed from above, as in Figure 2 in the appendix, it is easy to see that the top edge flanges in the accused design are widest near the front third of the jack, while the top edge flanges in the patented design are widest in the middle of the jack. Moreover, in the patented design, the distance between the outer edges of the rear caster brackets, at their widest point, is greater than the distance between the outer edges of the top

11

flanges at their widest point. This is also true in the accused design, but the difference in distances is not as great as in the patented design: in the accused design, the top edge flanges seem to "flare out" near the front to almost the same width as the rear caster brackets, making the jack appear almost as wide at the front as it is at the rear. Also, the contours of the top flanges and rear caster brackets in the patented design are more "linear" and have more abrupt directional changes than the contours of these same features on the accused design, which are more curved. All of these ornamental features working together results in the patented design appearing a bit like an arrow and thus streamlined, light, and sleek, while the accused design is somewhat bulbous and gives the impression of being wider and heavier.

From the side view, as in Figure 6 in the appendix, the patented design also appears more streamlined than the accused design. In the patented design, the space between the top line of the jack (the line formed by the profile of the top flange and the top of the chassis side plate at the rear) and the bottom line (the line formed by the profile of the bottom flange and the profile of the rear caster bracket) is generally narrow, and the overall shape gives the impression of a current of air sweeping over the area under the rear caster bracket. Again, this adds to the "sleek" or "streamlined" overall appearance of the design. In contrast, on the accused design, towards the rear of the profile view, the space between the top and bottom lines is wider, and the profile of the rear caster bracket is jagged rather than smooth. This results in a "boxier" appearance at the rear of the profile view, rather than the smooth and streamlined appearance of the patented design.

Of course, some elements of the accused design are nearly identical to the patented design. Perhaps the most obvious is the jack saddle, which, so far as I can tell, is exactly the same on both designs: the saddle is square with raised, rounded corners and a lined rubber saddle pad. However, several jacks in the prior art feature saddles that are squares with raised, rounded corners, including the HeinWarner 3-Ton and the D388,926 design. Still, the HeinWarner and the '926 designs do not use lined rubber saddle pads, and the incorporation of such pads into both the patented and accused designs weighs in Snap-on's favor.

Another similarity is the orientation of the jack saddle: on both the patented and accused designs, the square is rotated about 45 degrees, so that the corners are aligned with the cardinal points of a compass when viewed from above. This distinguishes the square saddles on both the patented design and the accused design from the images of prior-art square saddles in the record, which depict saddles with sides that are parallel to the sides of the jacks, such that the saddles' corners are aligned with the ordinal points of a compass rather than the cardinal points. However, it appears that this rotation is just a functional aspect of a floor jack that also appears in the prior art. The record contains images of both Snap-on's commercial embodiments of its patented design and the Daytona that depict the saddles parallel to the sides of the jacks rather than rotated. *See, e.g.*, ECF Nos. 27-2 (Snap-on jacks depicted with parallel saddles) & 27-12 (Daytona depicted with parallel saddle). Other images depict the saddles on both jacks rotated. *See* ECF No. 27-18. In light of this, I infer that the saddles are designed to rotate between the two positions to assist in placing it under the vehicle being jacked, and that jacks in the prior art also feature square saddles that

13

rotate.[4]  Because floor-jack saddles routinely feature square saddles that rotate, it is not likely that the eye of an ordinary observer familiar with the prior art would be drawn to any particular orientation of the saddle on any design.  *See Egyptian Goddess*, 543 F.3d at 676 ("When the differences between the claimed and accused design are viewed in light of the prior art, the attention of the hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ from the prior art.").

Aside from the jack saddles, the patented and accused designs share other ornamental aspects, including the design of the front wheels, cover plate, and jack-arm cover.  However, in evaluating infringement, the jury must determine whether "the deception that arises is a result of the similarities in the overall design, not of similarities in ornamental features in isolation."  *Richardson*, 597 F.3d at 1295.  And despite the similarities in the jack saddles and some of the other features viewed in isolation, I doubt that a jury would find that the overall effect of each design on the eye of the ordinary observer is the same, such that the ordinary observer would be deceived into believing that the accused design is the same as the patented design.  Again, the patented design is streamlined, while the accused design is wider and heavier.

To support its argument that an ordinary observer would be deceived by the Daytona design, Snap-on submits evidence of statements made by certain users of floor jacks.  These statements suggest that some users believe that the Daytona is similar to or the same as Snap-on's jacks.  First, Snap-on submits an affidavit from one of its potential customers, who states that he bought a Daytona rather than a Snap-on

---

[4] An example is the JEGS floor jack depicted in this video, which was uploaded to YouTube on June 5, 2009: https://www.youtube.com/watch?v=xUXL2_t4ZXI (last viewed January 3, 2017).

jack, and that he and his staff think the Daytona is "visually identical to Snap-on's jacks." First Aff. of Neil Wisener ¶ 8, ECF No. 27-26.  Second, Snap-on submits affidavits from some of its franchisees, who state that their customers have told them that, based solely on the visual similarities between Snap-on's jacks and the Daytona, they believe the jacks must be the same.  *See* Affs. of Greg Ferry, Brad Elder, Donald Barger, Ronald Giddens, & Michael McGihon.  Third, Snap-on submits evidence of comments made on Internet websites suggesting that some commenters believe that the jacks are the same because they look similar.  However, as explained below, I find that this evidence is not entitled to much weight, and that it does not indicate that an ordinary observer familiar with the prior art would be deceived by the design of the Daytona.

One problem with Snap-on's evidence concerning the visual similarities between its own jacks and the Daytona is that the evidence is primarily anecdotal and consists in large part of statements made either by biased witnesses (Snap-on's franchisees) or by unidentified Internet commenters.  Indeed, for all the record reveals, the Internet commenters who claim that the Daytona looks the same as Snap-on's jacks could be Snap-on employees or franchisees.  I do not mean to claim that the commenters actually are Snap-on's agents, but to highlight the general unreliability of statements made in Internet comment forums, which are made anonymously or by posters using pseudonyms.  I also note that, assuming the Internet comments are reliable, there is no consensus that the Daytona is visually the same as Snap-on's jacks.  While Snap-on points to a handful of comments suggesting that the jacks are the same, *see* Br. in Supp. at 19–20, other comments note that the jacks, especially when compared to the prior art, are different.  One commenter stated that he or she saw "plenty of visual

15

differences." ECF No. 44-2 at p.52 (comment #126). Another commenter stated that "[a]ll floor jacks in this class 'look like' each other and there ARE differences between the [Snap-on] & [Harbor Freight] jacks." ECF No. 44-4 at p. 59 (comment #777). A third commenter stated, "They're nowhere close to identical. Not sure why anyone thinks they're made by the same company." ECF No. 44-2 at p. 92 (comment #218). Thus, the Internet comments do not suggest that the hypothetical ordinary observer would be deceived by the Daytona's ornamental design.

A second problem with Snap-on's evidence is that it is hard to tell whether those who think the jacks look the same have factored out the functional aspects of the design. Yet, as explained above, for the Daytona to infringe, any perceived similarities between it and the patented design must be attributable to ornamental features rather than functional features. *OddzOn Prods.*, 122 F.3d at 1405. Further, at least some of those who think the jacks are "the same" could be referring to functional performance rather than appearance. For instance, Harbor Freight markets the Daytona as having the same or better weight capacity, lift height, and clearance as Snap-on's jacks, only at a cheaper price. *See* ECF No. 27-20. It thus could be the perception that the Daytona performs the same as Snap-on's jacks, rather than the jacks' ornamental similarities, that causes users to describe the jacks as "the same."

In short, I do not find Snap-on's anecdotal evidence regarding the designs of the two jacks persuasive. Thus, in assessing Snap-on's likelihood of success, I place more weight on a three-way comparison between the patented design, the accused design, and the closest prior art. And as explained above, when I perform that comparison, I find it unlikely that a jury would conclude that an ordinary observer familiar with the prior

16

art would be deceived into believing that the accused design is the same as the patented design. Therefore, I conclude that Snap-on is not likely to prove infringement at trial, and that it is not likely to succeed on the merits of its infringement claim.

In addition to disputing that the Daytona infringes, Harbor Freight argues that the '612 patent is invalid. To obtain a preliminary injunction in a patent-infringement suit, the patentee must show that it will likely prove infringement, and that it will likely withstand challenges to the validity of the patent. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009). Here, because I have already concluded that Snap-on is not likely to prove infringement, it is not necessary to determine whether Snap-on would also withstand Harbor Freight's validity challenge. Thus, I will not address that issue.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Snap-on's motion for a preliminary injunction (ECF No. 26) is **DENIED**.

**IT IS FURTHER ORDERED** that the parties' motions to seal (ECF Nos. 28, 38 & 48) are **GRANTED**.

Dated at Milwaukee, Wisconsin, this 4th day of January, 2017.

                                                          s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge

17

Case 2:16-cv-01265-LA   Filed 01/04/17   Page 17 of 20   Document 52

**APPENDIX**



18

 

FIG. 2



FIG. 6